## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL                    'O'

| Case No. | 2:14-cv-02036-CAS(SHx) | Date | February 4, 2015 |
|---|---|---|---|
| Title | DEAKINS HOLDING PTE LIMITED ET AL. V. NEWNET INVESTMENT GROUP LLC ET AL. | | |

| Present: The Honorable | CHRISTINA A. SNYDER | |
|---|---|---|
| Catherine Jeang | Not Present | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:**      (IN CHAMBERS): DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. #32, filed May 23, 2014)

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (Dkt. #36, filed June 9, 2014)

## I.      INTRODUCTION

Plaintiffs Deakins Holding PTE Limited, Cristian Moga, C. Manda Holding B.V. and Sebastian Liusnea filed this action on March 17, 2014, against defendants NewNet Investment Group, LLC and NewNet Holdings, LLC (collectively, "defendants"). Dkt. 1. The complaint asserts two claims for breach of contract, one against NewNet Investment, and one against NewNet Holdings. Id. The claims arise out of a dispute as to the correct interpretation of a stock purchase agreement (the "Agreement") entered into by plaintiffs, defendants, and a company known as 3ple-Media, B.V. ("3ple"). Pursuant to the Agreement, plaintiffs transferred their stake in 3ple to defendants, in exchange for a series of payments. The parties disagree about the Agreement's terms governing the calculation of the amount and breakdown of one of the payments, defined in the Agreement as the "Earnout Amount."

Defendants filed a motion for summary judgment on May 23, 2014, dkt. 22, and plaintiffs filed a motion for summary judgment on June 9, 2014, dkt. 36. Oppositions and replies were exchanged on both summary judgment motions, dkts. 43, 44, 51, 52, and a hearing was held on July 7, 2014.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                               **'O'**

| Case No. | 2:14-cv-02036-CAS(SHx) | Date | February 4, 2015 |
|----------|------------------------|------|------------------|
| Title | DEAKINS HOLDING PTE LIMITED ET AL. V. NEWNET INVESTMENT GROUP LLC ET AL. | | |

By order dated July 7, 2014, the Court denied both motions for summary judgment on the grounds that the relevant language of the Agreement was ambiguous. Dkt. 54 at 9. Accordingly, the Court concluded that it was appropriate to consider extrinsic evidence of the parties' intent in order to resolve the ambiguity, and directed the parties to conduct discovery into such evidence. Id. The parties were also instructed to provide the Court with supplemental briefing summarizing the evidence obtained during discovery. Id.

On December 1, 2014, both parties submitted supplemental briefs summarizing the relevant extrinsic evidence, dkts. 66, 67, and on December 8, 2014, the parties' each filed supplemental replies, dkts. 68, 69. The Court held a hearing on February 2, 2014. Having carefully considered the parties' arguments, the Court finds and concludes as follows.

## II.   BACKGROUND

### A.   The Stock Purchase Agreement[1]

Most of the relevant facts are not in dispute. On September 25, 2010, plaintiffs, defendants, and 3ple entered into a stock purchase agreement (the "Agreement"). Plaintiffs' Statement of Uncontroverted Material Facts ("PSUMF") ¶ 1; Defendants' Statement of Genuine Disputes ("DSGD") ¶ 1. The Agreement provides that it shall be "governed, construed an interpreted in accordance with the laws of the State of New York, without giving effect to principles of conflicts of law." Defendants' Statement of Uncontroverted Material Facts ("DSUMF") ¶ 20; Plaintiffs' Statement of Genuine Disputes ("PSGD") ¶ 20. The Agreement also includes an integration clause, which provides that "[t]his Agreement (including the documents and instruments referred to herein) (a) constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof." DSUMF ¶ 21; PSGD ¶ 21.

---

[1] Although the parties have each filed supplemental statements of uncontroverted facts, the various statements cited to in this section were filed in connection with the parties' original summary judgment motions.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                    **'O'**

| Case No. | 2:14-cv-02036-CAS(SHx) | Date | February 4, 2015 |
|----------|------------------------|------|------------------|
| Title | DEAKINS HOLDING PTE LIMITED ET AL. V. NEWNET INVESTMENT GROUP LLC ET AL. | | |

In accordance with the Agreement, plaintiffs sold and transferred all of their percentage shares in 3ple-Media to NewNet Holdings. DSUMF ¶ 2; PSGD ¶ 2. The Agreement requires NewNet Holdings to make a series of installment payments to plaintiffs, in consideration for plaintiffs' transfer of their shares in 3ple. DSUMF ¶ 4; PSGD ¶ 4. The Agreement provides for an initial payment of $2 million, followed by a second payment of $1.5 million, and a third payment of $1 million. DSUMF ¶¶ 5-7; DSUMF ¶¶ 5-7.

The Agreement also provides for the payment of an "Earnout Amount, if any, as determined in accordance with Section 1.4" of the Agreement. DSUMF ¶ 8; PSGD ¶ 8. Section 1.4 of the Agreement states the following:

> "[Defendants] shall pay to [Plaintiffs] an amount (the "Earnout Amount"), which shall not exceed Three Million Dollars ($3,000,000), equal to: Twenty per cent of the difference between the Revenues of the Earnout Period and the Earnout Threshold. In the event such amount is less than One Million Five Hundred Thousand Dollars ($1,500,000), [Defendants] shall pay an additional amount equal to the difference between (i) One Million Five Hundred Thousand Dollars ($1,500,000) and (ii) twenty per cent of the difference between the Revenues of the Earnout Period and the Earnout Threshold (the "Additional Amount"). [Defendants] shall elect to pay the Additional Amount in either cash or common stock issued by [Defendants]."

DSUMF ¶ 10; PSGD ¶ 10.[2] Defendants do not dispute that the Agreement provides that defendants shall pay the Earnout Amount to plaintiffs "no later than on the Earnout Payment Date," as defined by the Agreement. PSUMF ¶ 4; DSGD ¶ 4. The Agreement provides that the term "Earnout Threshold" means $5 million. DSUMF ¶ 13; PSGD ¶ 13. Additionally, the parties do not dispute that 3ple's revenues during the Earnout Period are $1,928,784. PSUMF ¶ 8; DSGD ¶ 8. However, the basis for this action is that the parties dispute whether an Earnout Amount is due under the Agreement when 3ple's revenues during the Earnout Period are less than $5 million. See PSUMF ¶ 10; DSGD ¶ 10.

---

[2] "Revenues" refers to the revenues of 3ple. See Agreement at 18; see also id. § 1.4.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          **'O'**

| Case No. | 2:14-cv-02036-CAS(SHx) | Date | February 4, 2015 |
|----------|------------------------|------|------------------|
| Title | DEAKINS HOLDING PTE LIMITED ET AL. V. NEWNET INVESTMENT GROUP LLC ET AL. | | |

### B.   The Court's July 7, 2014 Order

By order dated July 7, 2014, the Court found that the Agreement's ambiguity rendered summary judgment inappropriate, since "both parties' interpretations find some support in the language of the Agreement." Dkt. 54 at 6.

Plaintiffs proffered two arguments as to why the language of the contract unambiguously supports their interpretation requiring a $1.5 million payout, even where the $5 million Earnout Threshold is not met. First, as the Court recognized, "a literal reading of Section 1.4(b)(i) results in an Earnout Amount becoming due, in the amount of $1.5 million, regardless of whether the revenues of the Earnout Period exceed $5 million." Dkt. 54 at 6-7. To illustrate plaintiffs' position, the Court explained:

> The following hypothetical, in which revenues during the Earnout Period total $1 million, sets forth plaintiffs' interpretation. In this scenario, the Earnout Amount would be calculated as follows, according to a literal interpretation of Section 1.4(b)(i) of the Agreement: First, the difference between "Revenues of the Earnout Period" (here, $1 million) and the Earnout Threshold ($5 million), would be $4 million. Agreement § 1.4(b)(i). Twenty percent of that number is $800,000. The parties do not appear to dispute that this amount is payable only in cash. Then, according to plaintiffs, an "Additional Amount" is also due, equal to the difference between $1.5 million and $800,000, id., which comes to $700,000. The Additional Amount is payable "either in cash or in common stock." Id. Thus, if revenues during the Earnout Period are $1 million, then, according to plaintiffs, they are entitled to a payment of $800,000 in cash and $700,000 in cash or common stock. Likewise, if revenues during the Earnout Period are $9 million, then the difference between "Revenues of the Earnout Period" (here, $9 million) and the Earnout Threshold ($5 million), would be $4 million. Agreement § 1.4(b)(i). Twenty percent of that number is $800,000. As above, an Additional Amount becomes due, equal to the difference between $1.5 million and $800,000, which amounts to $700,000. Thus, if revenues during the Earnout Period are $9 million, then, according to plaintiffs, they are entitled to a payment of $800,000 in cash and $700,000

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                    **'O'**

| Case No. | 2:14-cv-02036-CAS(SHx) | | Date | February 4, 2015 |
|---|---|---|---|---|
| Title | DEAKINS HOLDING PTE LIMITED ET AL. V. NEWNET INVESTMENT GROUP LLC ET AL. | | | |

in cash or common stock, the exact same amount and cash versus stock mix as when Revenues of the Earnout Period were $1 million.

Id. at 6. Second, plaintiffs proffered a signed Letter of Intent dated July 30, 2010 ("July 30, 2010 LOI"), directing the court to the following language contained therein:

> If no Earn-Out level is achieved, or the parties are unable to agree on a mutually acceptable performance metric, [Defendants] will structure a final note (Third Note) equal to $1.5 million, of which [Defendants] would maintain the exclusive right to either pay in cash or convert into equivalent Stock ownership.

Id. at 7. Plaintiffs asserted that this language was incorporated into the final Agreement in the form of Section 1.4(b)(i), and, accordingly, that Section 1.4(b)(i) should be interpreted with reference to it. Id. at 8.

In contrast, defendants proffered three arguments in support of their interpretation of the Agreement, pursuant to which an Earnout Amount only becomes due if revenues during the Earnout Period exceed the $5 million Earnout Threshold. First, defendants pointed to the plain language of Section 1.4(b)(i), asserting that under plaintiffs' interpretation, "the Earnout Amount is a negative number when Earnout Period revenues are less than the Earnout Threshold." Id. at 7. Specifically, defendants contended that the difference between the Revenues of the Earnout Period and the Earnout Threshold is to be calculated by performing the following operation: $1,000,000–$5,000,000 = –4,000,000. Id. As the Court explained, however, "nothing in Section 1.4(b)(i) states that, when calculating the difference between two numbers, the larger number comes first." Id.

Second, defendants contended that the Agreement contemplates the possibility that an Earnout Amount might never become due because the Agreement makes two references to the Earnout Amount, followed by the words "if any." Id. at 8. For example, section 1.2(b) of the Agreement states that the "total consideration to be paid by [Defendants] . . . shall be . . . the sum of . . . Two Million Dollars . . . *plus* . . . One Million Five Hundred Thousand Dollars . . . *plus* . . . One Million Dollars . . . plus . . . the Earnout Amount, if any, as determined in accordance with Section 1.4 below."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                                       **'O'**

| Case No. | 2:14-cv-02036-CAS(SHx) | Date | February 4, 2015 |
|----------|------------------------|------|------------------|
| Title | DEAKINS HOLDING PTE LIMITED ET AL. V. NEWNET INVESTMENT GROUP LLC ET AL. | | |

Agreement § 1.2(b); <u>see also</u> Agreement § 8.3(a) (referring to "the Earnout Amount, if any, due or to become due to the Stockholders pursuant to this Agreement").

Third, defendants asserted that the plain meaning of the term "threshold" supports their interpretation of section 1.4(b)(i), noting that the Merriam-Webster dictionary defines "threshold" as a "level, point, or value above which something is true or will take place and below which it is not or will not." Dkt. 54 at 9. According to defendants, this definition "supports their contention that revenues during the Earnout Period must exceed (or at least meet) $5 million before an Earnout becomes due." <u>Id.</u>

## III.   LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim upon which the moving party seeks judgment. See <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial in order to defeat the motion. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986); <u>see also</u> Fed. R. Civ. P. 56(c), (e). The nonmoving party must not simply rely on the pleadings and must do more than make "conclusory allegations [in] an affidavit." <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 888 (1990); <u>see also</u> <u>Celotex</u>, 477 U.S. at 324. Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Id.</u> at 322; <u>see also</u> <u>Abromson v. Am. Pac. Corp.</u>, 114 F.3d 898, 902 (9th Cir. 1997).

In light of the facts presented by the nonmoving party, along with any undisputed facts, the Court must decide whether the moving party is entitled to judgment as a matter of law. See <u>T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 631 & n.3 (9th Cir. 1987). When deciding a motion for summary judgment, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                    **'O'**

| Case No. | 2:14-cv-02036-CAS(SHx) | Date | February 4, 2015 |
|----------|------------------------|------|------------------|
| Title | DEAKINS HOLDING PTE LIMITED ET AL. V. NEWNET INVESTMENT GROUP LLC ET AL. | | |

party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted); Valley Nat'l Bank of Ariz. v. A.E. Rouse & Co., 121 F.3d 1332, 1335 (9th Cir. 1997). Summary judgment for the moving party is proper when a rational trier of fact would not be able to find for the nonmoving party on the claims at issue. See Matsushita, 475 U.S. at 587.

## IV.   DISCUSSION

### A.   Interpretation of an Ambiguous Agreement Under New York Law

Under New York law, a trial court's "primary objective [in interpreting a contract] is to give effect to the intent of the parties as revealed by the language they chose to use" Seiden Assocs. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992) (citing Slatt v. Slatt, 477 N.E.2d 1099 (N.Y. 1985)). However, where the contractual language is ambiguous, "extrinsic evidence as to the parties' intent may properly be considered." JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009).

Courts applying New York law determine the parties' intent by looking to the "surrounding circumstances, [] the common and legal meanings of the terms involved, where such meanings are clear, and, of paramount significance, [] the manifest purpose sought to be accomplished" Teig v. Suffolk Oral Surgery Associates, 769 N.Y.S.2d 599, 600 (App. Div. 2003) (internal citation omitted); see also Kitching v. Brown, 73 N.E. 241, 241 (N.Y. 1905) ("One of the familiar rules applicable to the interpretation of ambiguous covenants and agreements is to ascertain, as nearly as may be, the situation of the parties, their surroundings and circumstances, the occasion and apparent object of their stipulations, and from all these sources to gather the meaning and intent of their language.").

In reviewing the surrounding circumstances, a "court may and should look to the prior negotiations to determine what was intended." Rudman v. Cowles Commc'ns, Inc., 280 N.E. 2d 867, 872 (N.Y. 1972). Although courts primarily consider "the objective manifestations of the intent of the parties as gathered by their expressed words and deeds," SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC, 467 F.3d 107, 125 (2d Cir. 2006) (quoting Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp., 361 N.E.2d 999, 1001 (N.Y. 1997)), "[a]t least with respect to a negotiated agreement, a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                    **'O'**

| Case No. | 2:14-cv-02036-CAS(SHx) | Date | February 4, 2015 |
|---|---|---|---|
| Title | DEAKINS HOLDING PTE LIMITED ET AL. V. NEWNET INVESTMENT GROUP LLC ET AL. | | |

party's subjective understanding, while not controlling, may shed light on the state of those negotiations and could bear on that party's objective actions," <u>SR Int'l Bus. Ins. Co.</u>, 467 F.3d at 126 (2d Cir. 2006).

Additionally, courts may consider "the parties' course of conduct throughout the life of the contract." <u>Hoyt v. Andreucci</u>, 433 F.3d 320, 332 (2d Cir. 2006). Moreover, "[t]he parties' interpretation of the contract in practice, prior to litigation, is compelling evidence of the parties' intent." <u>Ocean Transp. Line, Inc. v. Am. Philippine Fiber Indus., Inc.</u>, 743 F.2d 85, 91 (2d Cir. 1984) (citing <u>Old Colony Trust Co. v. Omaha</u>, 230 U.S. 100, 118 (1913) ("Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence.")).

Finally, on a motion for summary judgement, the "Court may resolve the ambiguity in the contractual language as a matter of law if there is no extrinsic evidence to support one party's interpretation of the ambiguous language or if the extrinsic evidence is so one-sided that no reasonable factfinder could decide contrary to one party's interpretation." <u>Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.</u>, 232 F.3d 153, 159 (2d Cir. 2000).

**B.    Extrinsic Evidence Exists to Support the Parties' Respective Interpretations of the Ambiguous Agreement**

There is only one issue in dispute in this litigation. Plaintiffs assert that, per the terms of the Agreement, they are owed a $1.5 million final payment (<u>i.e.</u>, the Earnout Amount) in connection with the sale of their business, 3ple, to defendants. Defendants, however, assert that they do not owe plaintiffs any final payment whatsoever, since the $5 million Earnout Threshold was not achieved. For the reasons that follow, the Court concludes that summary judgment is inappropriate, since extrinsic evidence exists to support both parties' interpretations of the Agreement.

**1.    Plaintiffs' Supplemental Briefing**

Plaintiffs advance four primary arguments as to why the extrinsic evidence supports their construction of the Agreement and compels summary judgment in their

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                    **'O'**

| Case No. | 2:14-cv-02036-CAS(SHx) | Date | February 4, 2015 |
|----------|------------------------|------|------------------|
| Title    | DEAKINS HOLDING PTE LIMITED ET AL. V. NEWNET INVESTMENT GROUP LLC ET AL. | | |

favor. First, plaintiffs again direct the Court to the parties' July 30, 2010 LOI. Pls.'
Supp. Mot. at 1. Plaintiffs assert that the parties' intent to guarantee plaintiffs a $1.5
million final payment, as unambiguously reflected in the July 30, 2010 LOI, remained the
parties' intent upon execution of the final Agreement on September 25, 2010, as reflected
in section 1.4(b)(i). Specifically, plaintiffs cite to the following language from the July
30, 2010 LOI—the "earnout" provision and "change of control" provision, respectively:

> If no Earn-Out level is achieved, or the parties are unable to agree on a
> mutually acceptable performance metric, [defendants] will structure a final note
> (Third Note) equal to $1.5 million, of which [defendants] would maintain the
> exclusive right to either pay in cash or convert into equivalent Stock ownership
> within NewNet Communications Technologies, to be paid on or before the 30
> month anniversary of the closing, in lieu of the Earn-Out.

> Should [defendants] enter into a change of control prior to the completion of
> the Earn-Out period; [defendants] retain[] the right to pay to [plaintiffs] the
> greater of $1.5 million (Third Note), or 10% of the net proceeds from such
> event to satisfy the Earn-Out in its entirety, up to $4M.

Faud Decl., Ex. 10 (July 30, 2010 LOI).

Second, plaintiffs contend that "there is no evidence that the parties ever mutually
agreed in the period after the [July 30, 2010] LOI was signed and before the [final
Agreement] was executed that Defendants would not be required to make a $1.5 million
final payment." Pls.' Supp. Mot. at 1. In support, plaintiffs direct the Court to the
testimony of Gary Moon, the outside consultant who negotiated the Agreement on
plaintiffs' behalf, as well as the testimony of plaintiffs Costi Manda, founder and
shareholder of 3ple, and StJohn Deakins, another 3ple shareholder.[3] Moon testified that

---

[3] Discovery confirmed that Deakins and Manda were the only two individually
named plaintiffs actually involved in negotiating the Agreement; the other two named
plaintiffs, Cristian Moga and Sebastian Liusnea, granted power of attorney to Manda and
did not participate in the negotiation of the transaction. Pls.' Supp. Mot. at 3, n.1 (citing
Faud Decl., Exs. 2; 3; 14 (Depo. Ex. 38 at DLA 44-45; Manda Depo. 104:19-107:4;

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                    **'O'**

| Case No. | 2:14-cv-02036-CAS(SHx) | Date | February 4, 2015 |
|---|---|---|---|
| Title | DEAKINS HOLDING PTE LIMITED ET AL. V. NEWNET INVESTMENT GROUP LLC ET AL. | | |

he "had very clear instruction from [plaintiffs] that the minimum acceptable consideration for this deal was $6 million," and if defendants' negotiator Chris Aye had told Moon that the guaranteed $1.5 million payment contained in the July 30, 2010 LOI was not in the final Agreement, "[plaintiffs] would have said, 'no deal,' and gone away." Faud Decl., Ex. 4 (Moon Depo. at 175:21-176:23). Manda also testified that the minimum plaintiffs were willing to accept for the deal was $6 million, Faud Decl., Ex. 3 (Manda Depo. at 178:17-179:13), and Deakins testified that the parties "always agreed [to] a final payment of $1.5 million as per the [July 30, 2010] LOI and that never changed through the negotiation," id., Ex. 2 (Deakins Depo. at 176: 14-17).

Plaintiffs also direct the Court to contemporaneous written communications between Moon, the named plaintiffs, and plaintiffs' counsel, which suggest that plaintiffs and Moon both believed that the $1.5 million guarantee was included in the final Agreement. For example, on September 9, 2010, Moon sent an email to plaintiffs' counsel instructing them to draft section 1.4 of the Agreement such that it conformed to the to July 30, 2010 LOI and contained both the guaranteed final payment, as well as the change in control provision. Id., Ex. 13 ("To keep the language consistent with the $1.5m guarantee on the earn-out as written in the LOI, it would look something like this: $0 in earn-out – guarantee is $1.5m cash or stock at Skyview/NewNet election; $1 to $1.49m in earn-out – cash on the earn-out; balance to $1.5m in cash or stock at Skyview/NewNet election; $1.5m+ in earn-out - cash . . . And of course, let's not forget the exit provision of the earn-out in the term sheet."). Further, in discussing his fee for closing the deal, Moon sent Deakins an email on September 15, 2010, which contemplated a $1.5 million minimum final payment, which could reach $3 million, depending on 3ple's performance upon sale to defendants. Id., Ex. 7. Moon explained that his fee proposal discounted his share of the final payment as follows: "An 8% discount on the first tranche, because you are guaranteed $1.5m regardless (for fee calculation, it does not matter if it is cash or stock, the fee is still cash); and 30% discount on the second tranche, because it is more speculative and harder to achieve." Id. Moreover, on September 23, 2010—just two days before the final Agreement was executed—Deakins sent an email to counsel confirming their approval of Moon's fee proposal, and attaching Moon's "fee calculator," which expressly states that the Earnout Amount due to plaintiffs

Deakins Depo. 21:2-22:6)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**               **'O'**

| Case No. | 2:14-cv-02036-CAS(SHx) | Date | February 4, 2015 |
|---|---|---|---|
| Title | DEAKINS HOLDING PTE LIMITED ET AL. V. NEWNET INVESTMENT GROUP LLC ET AL. | | |

is "min $1.5m, up to a maximum of . . . $ 3,000,000." <u>Id.</u>, Ex. 23.  Moreover, plaintiffs assert that defendants cannot point to any contemporaneous written evidence indicating that defendants intended to exclude the guaranteed $1.5 million payment from the final Agreement.  Pls.' Supp. Mot. at 8.   Instead, plaintiffs point to deposition testimony from Aye, Alex Soltani (Skyview's President and CEO), and Ron Pyles (New Net's CEO), indicating that none could represent that Moon and plaintiffs had <u>expressly</u> agreed to exclude the $1.5 million guarantee from the final Agreement.  <u>See Id.</u>, Ex. 1; Ex. 6; Ex. 5 (Aye Depo. at 155:8-156:7; Soltani Depo. at 84:13-22; Pyles Depo. at 64:16-66:17).

Third, plaintiffs argue that defendants themselves construed the Agreement—both before and after its execution—as guaranteeing plaintiffs a minimum final payment of $1.5 million.  Specifically, plaintiffs direct the Court to "four key employees" of defendant NewNet who construed the agreement as such: NewNet's current and former Chief Financial Officers, its Chief Technology Officer, and its Vice President of Corporate Development.  Pls.' Supp. Mot. at 10.  On September 22, 2010, Pyles sent a draft of the Agreement to Kutluk Uslu, NewNet's CTO, seeking comments.  Faud Decl., Ex. 17.  Uslu responded that, with regard to section 1.4(b)(i), "the way I read it we are guaranteeing $1.5m earnout. Is that the intent?"  <u>Id.</u>  There is no document evidencing Pyles's response, and notably, the language of section 1.4(b)(i) contained in this draft of the Agreement was not changed in the final Agreement.

On September 30, 2010, a few days after the final Agreement was executed, NewNet's VP of Corporate Development, Marco Zhu, sent an email to Aye, Soltani, and Mike Maher, NewNet's then CFO.  <u>Id.</u>, Ex. 15.  This email attached a chart of "major [Agreement] events including the payments," which contained a time line of defendants' payment obligations to plaintiffs, including an event titled "Earnout Payment."  <u>Id.</u>  The "Date" column stated that the Earnout Payment was due "[w]ithin 30 days after the Earnout Period (36 months from Closing) or Change of Control," and Zhu typed in the "Note" column, "Amount should be no less than $1,500,000."  <u>Id.</u>  In response, Aye stated "Thanks. This is helpful."  <u>Id.</u>, Ex. 16.  Plaintiffs point out that there is no evidence that either Pyles or Aye ever corrected Zhu's apparent misunderstanding of the terms of the Agreement.

On August 2, 2012, almost two years after the Agreement was executed, Maher sent an email with the subject "3PLE Earnout" to Darren Loos, NetNet's outside

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                    **'O'**

| Case No. | 2:14-cv-02036-CAS(SHx) | Date | February 4, 2015 |
|---|---|---|---|
| Title | DEAKINS HOLDING PTE LIMITED ET AL. V. NEWNET INVESTMENT GROUP LLC ET AL. | | |

accountant at the time the Agreement was executed, who was subsequently hired by NewNet.  Id., Ex. 18.  In it, Maher attached a copy of the final Agreement and explained the Agreement's earnout mechanism as follows:

> There is a min payment for the 3ple earnout of $1.5M and a max of $3M. A $5M revenue threshold must be achieved prior to payment in excess of the minimum… 3PLE's cumulative revenue since the close is now at $1.25M, so it is unlikely that anything in excess of the min payment will be required. I would say that liability now stands at $2.5M, $1.5M for the min earnout plus the $1M "Third Payment" due in Sep 2012. For specifics of the earnout language see page 6 of the attached SPA.

Id. (emphasis added).  Loos responded "Agreed. Thanks."  Id., Ex. 30.  Plaintiffs note that Maher was NewNet's CFO during the negotiation of the Agreement, and was aware of the deal terms as they were being negotiated, since Maher was responsible for advising NewNet on the financial impact of the Agreement.  Pls.' Supp. Mot. at 11. See, e.g., Aye Depo. at 89:10-25 (acknowledging that Maher reviewed drafts of the Agreement since "[Maher's] job was to model out future earnout components."); Pyles Depo. at 147-20:148:1 (acknowledging that he forwarded Maher drafts of the Agreement).

In January 2014, while defendants' and plaintiffs were discussing the cash/stock mix for the final payment, Maher and Loos—NewNet's CFO by that time—again exchanged emails concerning the Earnout Amount.  Id., Ex. 26, 27.  On January 24, 2014, plaintiffs sent defendants a letter demanding the $1.5 million final payment, which Maher forwarded to Loos.  Id., Ex. 26.  In response to a question from Loos, Maher states that, "Per the terms, we owe [plaintiffs] $1.5M regardless of what it's called, it's just a matter of how it's paid."  Id.  Then, on February 11, 2014, Maher sent an email regarding 3ple's balance sheet, referring to an entry on the balance sheet titled "Long Term Debt Payable" in the amount of €1,137,209, which converts to approximately $1.5 million, and suggesting that this entry "is the accrual for the minimum earnout due the [plaintiffs], which came due as of Sep 2013."  Id., Ex. 28.  Later in the chain, Loos confirms that the €1.37 million accrual is for the "earnout" and attaches a "debt summary" for 3ple containing the following statement:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          'O'

| Case No. | 2:14-cv-02036-CAS(SHx) | Date | February 4, 2015 |
|---|---|---|---|
| Title | DEAKINS HOLDING PTE LIMITED ET AL. V. NEWNET INVESTMENT GROUP LLC ET AL. | | |

As defined in the Stock Purchase Agreement, a maximum $3,000,000 earnout provision due to seller is due upon achieving certain revenue targets over a three-year period. Management had determined in the prior year that the full amount of the earnout was probable and reasonably estimable and thus $3M was recorded in the consolidated balance sheet due to seller. Due to the performance of the Company, this earnout is not expected to be fully achieved and only the minimum is expected to be realized or $1.5M. As such the contingent consideration has decreased by $1.5M offsetting goodwill. Amount is due Sept 25, 2013.

Id., Ex. 29 (emphasis added).  Plaintiffs note that this February 2014 exchange between Loos and Maher occurred "nearly two weeks after [defendants'] lawyers concluded that [defendants] did not intend to guarantee the Earnout Amount."  Pls.' Supp. Mot. at 12.

Finally, plaintiffs contend that throughout December 2013 and January 2014, defendants communicated their intent to make a final $1.5 million payment to plaintiffs, and "never expressed a belief that no payment was due until counsel stepped in at the end of January and concocted the position espoused by Defendants in this litigation." Supp. Mot. at 2.  Plaintiffs explain that these communications were made following a September 26, 2013 letter sent by plaintiffs to defendants, "advising [defendants] of their obligation under the [Agreement] to provide an accounting of 3ple-Media's revenues in connection with making a final payment."  Id. at 13.[4]

---

[4] Defendants seek to exclude evidence of these communications, asserting that they constitute settlement discussions and are thus inadmissible pursuant to Fed. R. Evid. 408. Defs.' Reply at 5.  The Court disagrees.  Rule 408 precludes admission of evidence regarding the "(1) furnishing, promising, or offering–or accepting, promising to accept, or offering to accept–a valuable consideration in compromising or attempting to compromise [a ] claim; and (2) conduct or a statement made during compromise negotiations about [a] claim," in order to "prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction."  Fed. R. Evid. 408(a).  Rule 408 only applies once a controversy exists.  David P. Leonard, The New Wigmore: A Treatise on Evidence: Selected Rules of Limited Admissibility § 3.7.2 (2014).  See also Josephs v. Pac. Bell, 443 F.3d 1050, 1064 (9th Cir. 2006) ("[T]he purpose of Rule 408 is to encourage the compromise and settlement of existing

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**              **'O'**

| Case No. | 2:14-cv-02036-CAS(SHx) | Date | February 4, 2015 |
|----------|------------------------|------|------------------|
| Title | DEAKINS HOLDING PTE LIMITED ET AL. V. NEWNET INVESTMENT GROUP LLC ET AL. | | |

        In response to plaintiffs' evidence, defendants assert that the July 30, 2010 LOI "is a dead end because the parties elected in their final integrated agreement . . . *not* to include the LOI's language guaranteeing a final $1.5 million payment." Defs.' Reply at 1 (emphasis in original). Further, defendants contend that evidence of plaintiffs' subjective intent to keep the guarantee is irrelevant, since it contradicts plaintiffs' "objective, manifested negotiation." Id. Finally, defendants contend that statements made by their employees regarding the Agreement after its execution are not relevant to the Agreement's interpretation, since "none of those employees negotiated the agreement or participated in a course of conduct under the agreement." Id.[5]

───────────────

disputes"). A controversy exists "when a dispute has arisen and when a claim has been made arising out of it. . . . [and] in most cases a dispute only arises when a claim is made." Id. See also Cassino v. Reichhold Chemicals, Inc., 817 F.2d 1338, 1342 (9th Cir. 1987) (affirming trial court's conclusion that Rule 408 did not bar admission of a settlement agreement and release since plaintiff "had not asserted any claim at the time [defendant] asked for the release"). Here, the alleged settlement offer was transmitted via text message by plaintiff Manda to Pyles on December 23, 2013. See Faud Decl., Ex. 19. At that point in time, 3ple's revenues had not yet been announced—i.e., the revenues necessary to calculate the Earnout Amount. Defs.' Reply at 5. Accordingly, "to get out ahead of th[e] [revenues], Plaintiffs proposed a 'compromise' by which they would 'settle' for $2.25 million (as compared to the $1.5 million in cash/stock for which they are now suing). [citation]. Once Revenues came in well under the Earnout Threshold, NewNet refused to pay. " Id. Thus, as defendants themselves explain, a Rule 408 "controversy" had not yet arisen, since New Net had not yet "refused to pay." Rather, it appears that plaintiffs sought to take advantage of an absence of revenue figures in order to maximize their final payment amount. See also In re E. Airport Dev., LLC, 443 B.R. 823, 829 (B.A.P. 9th Cir. 2011) (explaining that "ordinary business communications" between parties are not compromise negotiations within the meaning of Rule 408). Accordingly, the Court declines to exclude evidence of the December 2013 and January 2014 communications between the parties.

        [5] Defendants also contend that communications between plaintiffs and defendants in December 2013 and January 2014 are settlement negotiations that are not admissible pursuant to Rule 408. As stated above, the Court disagrees.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                    **'O'**

| Case No. | 2:14-cv-02036-CAS(SHx) | Date | February 4, 2015 |
|---|---|---|---|
| Title | DEAKINS HOLDING PTE LIMITED ET AL. V. NEWNET INVESTMENT GROUP LLC ET AL. | | |

### 2.    Defendants' Supplemental Briefing

In their separate supplemental briefing, defendants assert that the extrinsic evidence supports their interpretation of the Agreement for three reasons.[6]  First, defendants proffer evidence of the parties' negotiations that occurred between the execution of the July 30, 2010 LOI and the execution of the of the final Agreement on

---

[6] Defendants also proffer two additional arguments, neither of which is persuasive. First, defendants revive their contention that the language of the Agreement unambiguously supports their interpretation.  Defs.' Supp. Mot. at 9.  In effect, defendants ask the Court to reconsider its July 7, 2014 order finding ambiguity and directing the parties to conduct discovery into relevant extrinsic evidence.  Defendants, however, have not presented the Court with any of the proper bases for reconsideration of a prior order, as set forth in Local Rule 7–18.  The Court thus will not entertain defendants' renewed arguments.

Defendants also assert that plaintiffs have "conceded" that defendants' interpretation of the Agreement is correct, pointing to plaintiff Deakins' deposition testimony.  Specifically, when asked why the words "if any" precede "Earnout Amount" in section 1.2(b) of the final Agreement, since they contradict plaintiffs' interpretation of section 1.4(b)(i), Deakins answered that the words "if any" were "boilerplate" and were included by mistake.  See Schweder Decl., Ex. P (Deakins Depo. at 150:4-157:7).  From this testimony, defendants conclude that plaintiffs knew the "if any" language operated to remove the guaranteed $1.5 million and "did not plead mistake because there was no mistake."  Defs.' Supp. Mot. at 10.  It appears to the Court that this argument is simply a variation upon defendants' assertion that the language of the contract is unambiguous. Indeed, as plaintiffs assert, their "position has been consistent throughout this litigation: Section 1.4 of the [Agreement] reflects the parties' mutual, agreed intent regarding the guaranteed final payment due to Plaintiffs."  Pls.' Reply at 2.  Moreover, Deakins' testimony appears to be a reaction to defendants' arguments regarding the proper interpretation of the agreement, not a reflection of plaintiffs' intent at the time of contracting.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL                    'O'

| Case No. | 2:14-cv-02036-CAS(SHx) | Date | February 4, 2015 |
|----------|------------------------|------|------------------|
| Title | DEAKINS HOLDING PTE LIMITED ET AL. V. NEWNET INVESTMENT GROUP LLC ET AL. | | |

September 25, 2010, asserting that this evidence establishes that defendants were able "to demand, and obtain, the removal of a $1.5 million guarantee that had been in the LOI and the insertion of an earnout threshold in the [Agreement]."  Defs.' Supp. Mot. at 1 (emphasis in original).

Defendants direct the Court to evidence indicating that the overall price of the deal—and particularly, the structure of the Earnout Amount—remained uncertain following execution of the July 30, 2010 LOI.  For example, in a July 31, 2010 email, Moon advised Deakins that they had "pushed [defendants] far outside of their comfort zone" in terms of price.  Schweder Decl., Ex. M.  Moon then warned Deakins that, with a 45 day due diligence phase approaching, "[w]e're going to want to be very careful . . . to make sure there are very few issues for [defendnats] to have an excuse to re-cut the deal from what they find in diligence."  Id.  Defendants retained the firm Miller Cooper to conduct the financial due diligence of 3ple and, as revealed by August 2010 email exchanges between Miller Cooper and Aye, Miller Cooper expressed concerns about 3ple's revenue stream and accounting irregularities.  See id, Exs. S, T.  Further, Aye testified that he subsequently told Moon that Miller Cooper "didn't like this deal; they know how we do deals, and this deal's way too expensive."  Id, Ex. R (Aye Depo. at 96:1-3).  Aye also testified that, in light of Miller Cooper's findings, Aye told Moon that they needed work on the "earnout threshold before [plaintiffs] receive another dollar." Id. at 98:5-6.

Following this conversation, Aye and Moon exchanged a series of emails regarding the appropriate earnout threshold.  In an August 21, 2010 email, Aye sent Moon a proposal for a "simple structure of the earnout component."  Id., Ex. U.  Aye proposed a $7.5 million revenue threshold, which, if reached by 3ple, would obligated defendants to pay plaintiffs 15% of 3ple's total revenues.  Id.  On August 26, 2010, Moon proposed a multi-tiered earnout structure, with no guarantee, involving different percentage earnout payments.  Id., Ex. V.  Aye responded expressing his disagreement, and noting that "with respect to the earnout structure . . . we are quite far apart."  Id.  On September 8, 2010, Aye once again proposed a $7.5 million revenue threshold with an earnout of 15%.  Id., Ex. X.  Moon countered with the following:  "Threshold: $7.5m total; First level earn-out, to $12.5m: 30%  ($1.5m of the earn-out); Second level earn-out, to $17.5m: 20%

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                           **'O'**

| Case No. | 2:14-cv-02036-CAS(SHx) | Date | February 4, 2015 |
|----------|------------------------|------|------------------|
| Title | DEAKINS HOLDING PTE LIMITED ET AL. V. NEWNET INVESTMENT GROUP LLC ET AL. | | |

($1.0m of the earn-out); 15% of revenue thereafter up to $3.0m in aggregated earn-out."
Id., Ex. Y. (emphasis added).  As defendants point out, Moon's proposal did not contain
any indication that the $1.5 million was to be "guarenteed."

　　　Notably, when Moon forwarded the September 8, 2010 email exchange to Deakins,
Deakins responded "what happened to the 1.5m guaranteed?"  Id., Ex. AA.  Moon replied
to Deakins, stating that he would "send something out to [plantiffs'] internal group for
drafting that includes the guarantee."  Id.  Moon then sent an email to plaintiffs'
counsel—copying plaintiffs, but not defendants—instructing counsel to draft the
Agreement such that it was "consistent with the $1.5 million guarantee on the earn-out as
written in the [July 30, 2010] LOI."  Id., Ex. EE.  Defendants point out that the
September 14, 2010 draft produced as a result of Moon's instruction continued to refer to
the earnout amount with the prefatory words "if any" in section 1.2.  Id., Ex. GG.  When
on September 15, 2010, plaintiffs' counsel asked Moon to review a draft of the
Agreement to "confirm that the "earnout provision reflects your last discussion with
[defendants]," id., Ex. FF, Moon responded by stating that "[t]he earn-out is just a
straight 20% of everything over $5m, up to the maximum of $3m in earn-out payment,"
id.  Aye testified that Moon shared this draft with him on September 16, 2010, and that
Moon confirmed that the "if any" language contained in section 1.2 ensured that plaintiffs
were not entitled to a guaranteed earnout payment.  See id., Ex. R (Aye Depo. at 131:6-
20; 142:16-143:2; 153:15-17; 155:15-156:5).  Pyles testified to having a similar
conversation with Moon.  See id., Ex. JJ (Pyles Depo. at 200:7-202:16).

　　　Second, defendants assert that the industry meaning of the term "earnout"
precludes interpreting the earnout as "guaranteed."  For example, defendants note that
Thomson Reuters defines "earnout" as "one or more contingent payments of purchase
price after the closing which are payable when certain specified targets . . . are satisfied
within certain specified periods. If the target company fails to achieve these specified
targets within the specified periods, the buyer is relieved from making the contingent
payments . . . ." Defs.' Supp. Mot. at 14 (emphasis added).  Defendants also direct the
Court to definitions of "earnout" published by Business Law Today, the Paul Weiss firm,
the Mayer Brown firm, and the NASDAQ, explaining that "the words used in these
definitions are active . . . [and] emphasize that the acquired company must do something

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                    **'O'**

| Case No. | 2:14-cv-02036-CAS(SHx) | Date | February 4, 2015 |
|----------|------------------------|------|------------------|
| Title | DEAKINS HOLDING PTE LIMITED ET AL. V. NEWNET INVESTMENT GROUP LLC ET AL. | | |

to achieve an earnout." Id.; see, e.g., Schweder Decl. Ex. OO (Business Law Today publication) (defining earnout as "a contingent portion of the purchase price that is paid after closing to the seller upon the target business achieving certain agreed financial or non-financial benchmarks within a specified period of time."). Thus, according to defendants, "[t]he notion of a guarantee is wholly antithetical to an earnout." Defs.' Supp. Mot. at 14.

Finally, defendants assert that the extrinsic evidence demonstrates that plaintiffs' construction of section 1.4(b)(i) actually undermines plaintiffs' stated goals during negotiations. During negotiations, plaintiff Manda commented in a July 28, 2010 email to Moon: "I don't want stock as part of this deal!" Schweder Decl., Ex. RR. According to defendants, pursuant to their construction of the language of section 1.4(b)(i), "[t]he more the post-closing business earned – above the threshold – the more cash Plaintiffs would receive." Defs.' Supp. Mot. at 15. On the other hand, following plaintiffs' construction of section 1.4(b)(i) results in the "exact same amount and cash versus stock mix" regardless of earnings. Id. (Quoting July 7, 2014 order at 6).

In response to defendants evidence, plaintiffs contend that defendants have not pointed to any evidence reflecting "an agreement by Plaintiffs to remove the $1.5 million guaranteed final payment from the [Agreement]." Pls.' Reply at 3. Rather, according to plaintiffs, defendants merely point to their unsuccessful attempts to remove the guarantee. Id. Further, plaintiffs assert that, with regard to Moon's negotiations with Aye regarding the threshold, Moon testified that the emails only impacted the "variable" portion of the final payment—i.e., the amount above $1.5 million but below $3 million—not the "guaranteed" portion. Id. at n.1 (citing Supp. Faud Decl., Ex. 4 (Moon Depo. at 174:20-25)). Plaintiffs further assert that, as testified to by Moon, there is no standard definition of an earnout. Id. at 3 (citing Supp. Faud Decl., Ex. 4 (Moon Depo. at 58:24-63:6). Finally, plaintiffs assert that the earnout structure in section 1.4(b)(ii) "makes perfect sense," since plaintiff Manda testified that plaintiffs expected 3ple's revenues to be between $5 and $25 million, as "as revenues climb above $5 million, plaintiffs are entitled to more cash and less stock." Id. at 5.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                                    **'O'**

| Case No. | 2:14-cv-02036-CAS(SHx) | Date | February 4, 2015 |
|----------|------------------------|------|------------------|
| Title | DEAKINS HOLDING PTE LIMITED ET AL. V. NEWNET INVESTMENT GROUP LLC ET AL. | | |

### 3.     Analysis of Extrinsic Evidence

As noted above, the Court concludes that summary judgment is inappropriate, since extrinsic evidence exists to support each party's interpretation of the Agreement, and the evidence is not "so one-sided that no reasonable factfinder could decide contrary to one party's interpretation."

First, a reasonable juror could conclude that plaintiffs' interpretation is correct. Although the parties' objective manifestations of intent are most probative of the meaning of a contract, a party's subjective, contemporaneous intent is not entirely irrelevant to the interpretation of a negotiated contract, as defendants contend.   See SR Int'l Bus. Ins. Co., 467 F.3d at 126 (2d Cir. 2006) ("At least with respect to a negotiated agreement, a party's subjective understanding, while not controlling, may shed light on the state of those negotiations and could bear on that party's objective actions."). Here, evidence of plaintiffs' subjective intent unequivocally suggests that they believed that the terms of the Agreement guaranteed a $1.5 million final payment, regardless of whether the $5 million Earnout Threshold was achieved.

Further, the fact that defendants' own employees interpreted the Agreement to require a $1.5 million final payment tends to suggest that plaintiffs' interpretation of section 1.4(b)(i) reflects the intent of the parties. See Old Colony Trust Co., 230 U.S. At 118 (1913) ("Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence."). It is particularly probative that NewNet's CFO, Maher—who, according to Aye and Pyles' own testimony, reviewed drafts of the Agreement and was kept abreast of the negotiations—has consistently interpreted the Agreement as requiring a $1.5 million final payment. Moreover, the evidence indicates that defendants' own accountants anticipated a minimum final payment in the amount of $1.5 million. Although defendants contend that this cannot constitute evidence of a course of conduct under the agreement, they cite no authority for that proposition.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          **'O'**

| Case No. | 2:14-cv-02036-CAS(SHx) | Date | February 4, 2015 |
|----------|------------------------|------|------------------|
| Title | DEAKINS HOLDING PTE LIMITED ET AL. V. NEWNET INVESTMENT GROUP LLC ET AL. | | |

However, a juror could also conclude that the extrinsic evidence supports defendants' interpretation of the Agreement. First, the negotiating history of the parties clearly indicates that the price of the deal—and particularly, the structure of the Earnout Amount embodied in section 1.4(b)(i)—was anything but certain following the execution of the July 30, 2010 LOI. And, while plaintiffs assert that, in negotiating the threshold amount with Aye, Moon was only addressing the "variable," as opposed to "guaranteed" portion of the earnout, these emails contain no reference to the terms "variable" or "guaranteed." Rather, on their face, the emails indicate that Moon and Aye were negotiating a single, contingent earnout payment tied to achievement of a revenue threshold. Further, defendants persuasively argue that the parties knew how to draft language expressly guaranteeing a minimum payment—as evidenced by the July 30, 2010 LOI—but opted not to use such language in the Agreement.

Second, although it is clear that Moon communicated <u>to his clients and their counsel</u> that the $1.5 million guarantee was contained in the final version of the Agreement, there is no evidence suggesting that Moon ever relayed this subjective intent to defendants. As noted above, a review of the email exchanges between Moon and defendants' negotiators immediately preceding the execution of the Agreement reveals no objective manifestation of an intent to include the $1.5 million guarantee in the Agreement. Indeed, a juror might reasonably conclude that Moon assured his clients that the Agreement guaranteed them a $1.5 million payment, while simultaneously assuring defendants that the "if any" language contained in section 1.2 eliminated any such guarantee.

Finally, the industry usage of the term "earnout" clearly support defendants' assertion that they owed no final payment to plaintiffs absent achievement of the $5 million Revenue Threshold.

In sum, because the extrinsic evidence supports each parties' interpretation of the ambiguous Agreement, the Court cannot conclude as a matter of law that one parties' interpretation prevails. Accordingly, the Court DENIES the parties' respective motions for summary judgment.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**           **'O'**

| Case No. | 2:14-cv-02036-CAS(SHx) | Date | February 4, 2015 |
|----------|------------------------|------|------------------|
| Title | DEAKINS HOLDING PTE LIMITED ET AL. V. NEWNET INVESTMENT GROUP LLC ET AL. | | |

## V.    CONCLUSION

In accordance with the foregoing, plaintiffs' motion for summary judgment is DENIED, and defendants' motion for summary judgment is also DENIED.

IT IS SO ORDERED.

|          | 00 | : | 00 |
|----------|----|----|----|
| Initials of Preparer | | CMJ | |